

AO 106A  (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT
### for the
### Southern District of California

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>Blue iPhone 15 Pro Max with white case<br>Seized as FP&F No. 2024565500022801<br>("Target Device") | Case No. **24-mj-03363** |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A, incorporated herein by reference.

located in the _____Southern_____ District of _____California_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| Title 8, U. S. C. § 1324 | Alien Smuggling |

The application is based on these facts:
See Attached Affidavit of Border Patrol Agent James T. Burns, incorporated herein by reference.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

James T. Burns, Border Patrol Agent, U.S. Border Patrol
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____telephone_____ *(specify reliable electronic means)*.

Date: _____09/04/2024_____

_____
*Judge's signature*

City and state: San Diego, California

HON. JILL L. BURKHARDT, U.S. Magistrate Judge
_____
*Printed name and title*

# ATTACHMENT A

## PROPERTY TO BE SEARCHED

The following property is to be searched:

Blue iPhone 15 Pro Max with white case
Seized as FP&F No. 2024565500022801
**(Target Device)**

Target Device is currently in the custody of the Department of Homeland Security, Customs and Border Protection, United States Border Patrol, San Diego Sector.

**ATTACHMENT B**

ITEM TO BE SEIZED

Authorization to search the cellular telephone described in Attachment A includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephone for evidence described below. The seizure and search of the cellular telephone shall follow the search methodology described in the affidavit submitted in support of the warrant.

The evidence to be seized from the cellular telephone will be electronic records, communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data, for the period of **June 9, 2024 to June 23, 2024:**

a. tending to indicate efforts to smuggle aliens from Mexico into the United States;

b. tending to identify accounts, facilities, storage devices, and/or services– such as email addresses, IP addresses, and phone numbers–used to facilitate alien smuggling and transportation of smuggled aliens;

c. tending to identify co-conspirators, criminal associates, or others involved in alien smuggling, or transportation of smuggled aliens;

d. tending to identify travel to or presence at locations involved in the smuggling, transportation, or harboring of illegal aliens, such as stash houses, load houses, or delivery points;

e. tending to identify the user of, or persons with control over or access to, the Target Device(s); and/or

f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above,

which are evidence of violations of Title 8, United States Code, Section 1324.

**AFFIDAVIT**

I, James T. Burns, being duly sworn, hereby state as follows:

**INTRODUCTION**

1.      I submit this affidavit in support of an application for warrant(s) to search the following electronic device:

> Blue iPhone 15 Pro Max with white case
> Seized as FP&F No. 2024565500022801
> **("Target Device")**

The **Target Device**, as further described in Attachment A and to seize evidence of crime, specifically, violations of Title 8, United States Code, Section 1324 (Alien Smuggling), as further described in Attachment B.

2.      The requested warrant relates to the investigation and prosecution of Jeremy Paul BROWN-Wheaton for conspiring to transport and move an illegal alien within the United States. The **Target Device** is currently in the custody of Department of Homeland Security, Customs and Border Protection, United States Border Patrol, San Diego Sector.

3.      The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses, including my review of reports prepared by other law enforcement officers and agents.  This affidavit is intended to show that there is sufficient probable cause for the requested warrant and does not purport to set forth all of my knowledge of the investigation into this matter.   Dates and times are approximate.

**TRAINING AND EXPERIENCE**

4.      I have been employed by the USBP since 2008 and am currently assigned to the San Diego Sector Prosecutions Unit. I graduated from the Border Patrol Basic Academy

1

at the Federal Law Enforcement Training Center in Artesia, New Mexico. I am a Federal Law Enforcement Officer within the meaning of Rule 41(a)(2)(C), Federal Rules of Criminal Procedure and have been a Federal Law Enforcement Officer for sixteen years. I am authorized by Rule 41(a) Federal Rules of Criminal Procedure to make applications for search and seizure warrants and serve arrest warrants. I have experience and have received training with respect to conducting investigations of immigration and criminal violations of Titles 8, 18, 19, and 21 of the United States Code.

5.     My current duties involve the preparation of criminal and administrative cases for prosecution, including the use of linking related subjects and information via electronic equipment and telephones. In the course of my duties, I investigate and prepare for prosecution cases against persons involved in the inducement, transportation, and harboring of illegal aliens into and within the United States; and, the utilization of illegally-obtained, counterfeit, altered or genuine immigration documents by illegal aliens to illegally gain entry or remain in the United States.

6.     During my tenure as a Border Patrol Agent, I have participated in the investigation of a number of cases involving the smuggling of aliens from Mexico into the United States and transportation of illegal aliens within the United States, which have resulted in the issuance of arrest warrants, search warrants, seizure warrants, and the indictments of persons for alien smuggling, including drivers, passengers, and guides.

7.     Through the course of my training, investigations, and conversations with other law enforcement personnel, I have gained a working knowledge of the operational habits of alien smugglers and alien transporters, in particular those who attempt to smuggle aliens into the United States from Mexico and transport them throughout the Southern District of California. I am aware that it is a common practice for alien smugglers to work in concert with other individuals and to do so by utilizing cellular telephones to maintain communications with co-conspirators and/or illegal aliens in order to further their criminal

2

activities.  Because they are mobile, the use of cellular telephones permits alien smugglers and transporters to easily carry out various tasks related to their smuggling activities, including, *e.g.*, remotely monitoring the progress of the aliens while the aliens are in transit, providing instructions to transporters, guiding aliens to specific pick up locations, warning accomplices about law enforcement activity in the area and the status of check-point operations, and communicating with co-conspirators who guide aliens, coordinate drop off locations, and/or operate alien stash houses.

8.     The smuggling of aliens generates many types of evidence, including, but not limited to, cellular phone-related evidence such as voicemail messages referring to the arrangements of travel, names, photographs, text messaging (via SMS or other applications), and phone numbers of co-conspirators and illegal aliens.  For example, drivers and passengers responsible for transporting illegal aliens are typically in telephonic contact with co-conspirators immediately prior to and/or following the crossing of the illegal aliens at the border, at which time they receive instructions, including where to pick-up the illegal aliens for transportation into the United States and where to take the illegal aliens after crossing into the United States.  These communications may also include locations for delivery to stash houses and/or sponsors.  Illegal aliens also are typically in telephonic contact with co-conspirators prior to and following their crossing in order to make smuggling arrangements, receive instructions, and report their locations after crossing.  It is common for alien smugglers to be in contact with co-conspirators weeks to months in advance of an event to recruit drivers and to coordinate the event. It is also common for co-conspirators to continue to contact each other by phone calls, social media, or messaging applications when contact is lost with the driver after an apprehension has occurred.

9.     Based upon my training, experience, and consultations with law enforcement officers experienced in alien smuggling investigations, and all the facts and opinions set

3

forth in this affidavit, I know that cellular telephones (including their Subscriber Identity Module (SIM) card(s)) can and often do contain electronic evidence, including, for example, phone logs and contacts, voice and text communications, and data, such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data. In particular, in my experience and consultation with law enforcement officers experienced in alien smuggling investigations, I am aware that individuals engaged in alien smuggling may store photos and videos on their cell phones that reflect or show co-conspirators and associates engaged in alien smuggling, as well as images and videos with geo-location data identifying alien smuggling transportation routes, and communications to and from recruiters and organizers.

10. This information can be stored within disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephone. Specifically, searches of cellular telephones may yield evidence:

a. tending to indicate efforts to smuggle aliens from Mexico into the United States;

b. tending to identify accounts, facilities, storage devices, and/or services–such as email addresses, IP addresses, and phone numbers–used to facilitate alien smuggling and transportation of smuggled aliens;

c. tending to identify co-conspirators, criminal associates, or others involved in alien smuggling, or transportation of smuggled aliens;

d. tending to identify travel to or presence at locations involved in the smuggling, transportation, or harboring of illegal aliens, such as stash houses, load houses, or delivery points;

e. tending to identify the user of, or persons with control over or access to, the Target Device(s); and/or

f.   tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

### FACTS SUPPORTING PROBABLE CAUSE

11.   On June 23, 2024, Border Patrol Agents A. Guzman, B. Lugo, and R. Aguayo were performing their assigned duties at the Campo Border Patrol Station. Agent Guzman was dressed in plain clothing and wearing body armor with insignias and patches clearly displayed and was operating in an unmarked government vehicle with functioning lights and siren. Agents Lugo and Aguayo were dressed in rough duty uniform and wearing body armor with insignias and patches clearly displayed and were both operating in marked Border Patrol vehicles with functioning lights and siren.

12.   Approximately 11:40 AM, San Diego Sector dispatch advised that there was an image on a  mobile surveillance camera of a heavy set Hispanic male wearing a light blue shirt with blue jeans, and appeared to be wearing pieces of cloth wrapped around his shoes, known to Border Patrol Agents to be utilized to disguise the signifying marks on the soles. This is a common tactic used by smugglers and illegal aliens to make following their footprints more difficult for Border Patrol Agents.

13.   Approximately 11:45 AM Border Patrol agents advised on the radio of a white SUV traveling eastbound on Humphreys dirt road that has not been previously seen in the area, which was seen by U.S. Border Patrol cameras located directly north of the U.S./Mexico International Boundary. This is an area that is commonly used by smugglers to pick up and transport their illicit cargo further into the United States. This dirt road is heavily washed out and not commonly used as a road by any sedan or motoring public outside of people residing within the area. Border Patrol agents advised that the white SUV was heading westbound on Humphreys Road.

14.     Agent Lugo was traveling eastbound on Humphreys Road when he heard this information on the service radio and encountered a white SUV heading westbound approaching him at end of pavement on Humphreys Road. As the white SUV approached him, he observed two occupants inside the vehicle and the driver making eye contact for a moment before looking away. The driver was wearing a white shirt with a dark complexion. Agent Lugo then made a U-turn to get directly behind the vehicle and conduct records checks on the white SUV. Record checks revealed the white Mercedes Benz bearing a California license registered to Hertz Rentals LLC out of San Francisco, CA. It is commonly known to Border Patrol Agents that rental vehicles are utilized to alien smuggle as it prevents the seizure of personally owned vehicles.

15.     Agent Lugo conducted a vehicle stop upon the Mercedes. The Mercedes yielded. Agent Lugo approached the vehicle and observed two occupants: the driver in a white shirt who appeared to be of African American descendant and the passenger who was on his phone. The passenger was a Hispanic male wearing a blue shirt and matched the description of the man in the camera that San Diego dispatch announced minutes prior. Agent Lugo identified himself as a Border Patrol Agent and conducted an immigration inspection upon both individuals. The driver avoided answering the question, and asked why Agent Lugo had pulled him over. The passenger was still on the phone and Agent Lugo told him to hang up the cell phone. The passenger complied with this request. Agent Lugo then advised the driver again that he was conducting an immigration inspection then asked him of what country was his citizenship. The driver stated he was a United States Citizen. Agent Lugo then asked the passenger. The passenger stated, "Tijuana". Agent Lugo asked the passenger if he had proper documentation to be legally present in the United States. The passenger looked at Agent Lugo and didn't answer. During this time, the driver continued asking why he had pulled him over so Agent Lugo would stop talking to the

6

1  passenger. Agent Lugo asked the passenger again if he was here in United States illegally.

2  The passenger nodded his head up and down stating "yes".

3  16.    Agent Lugo instructed the driver twice to get out the vehicle. The driver did not comply. He began to put his seatbelt on and reached to turn the vehicle on. Agent Lugo

4  then repeated his command and told him to get out of the car because he was being arrested.

5  Agent Lugo attempted to open the driver door, but it was locked. Agent Lugo reached inside the vehicle through the window to try to remove the driver's seatbelt to remove him

6  from the driver seat. The driver drove off at a high rate of speed. Agent Lugo then advised

7  San Diego Sector dispatch that the vehicle fled the scene. Agent Lugo then ran back to his vehicle to pursue the white Mercedes.

8
9  17.    At approximately 11:56 AM, BPA Guzman positioned himself approximately 200 yards east of a location known to Border Patrol as Split Rock. BPA Guzman parked

10  his vehicle facing west and placed a VID south of SR 94. This location of SR 94 is

11  approximately .35 of a mile of a straight stretch of road. This area has sufficient amount of room for a vehicle to safely pull to the shoulder in an emergency situation. BPA Guzman

12  repositioned himself at the rear of his vehicle for concealment. At approximately 12:00

13  AM, BPA Guzman was informed by Customs and Border Protection Air assets, via the

14  agency radio, that the Mercedes was traveling towards his location. At this time, BPA Guzman was informed no other vehicle was traveling with the Mercedes as it approached

15  his location. BPA Guzman deployed the VID across the road via a pull method. BPA

16  Guzman observed a white Mercedes SUV approach his location with only one visible

17  occupant being a African American male driver. As the driver approached the VID, he abruptly applied the brakes causing the tires to screech prior to driving over the VID. The

18  Mercedes continued driving east on SR 94. During this time, BPA Guzman announced via

19  the agency radio "Good Spikes" and "Spikes Clear" to inform nearby agents of a successfull

20  7

21

deployment. BPA Guzman placed the VID into his vehicle and began to travel east on SR 94.

18.     At approximately 12:07 PM, BPA Guzman heard via the agency radio that the vehicle was traveling south on Forest Gate Road. Shortly after, as BPA Guzman approached a location known to Border Patrol as "Juvi Camp", he observed an African American male wearing a white t-shirt and a blue backpack running east away from agents inside the Juvi Camp. Agent guzman was able to encounter the individual, later identified as defendant Jeremy Paul BROWN-Wheaton. This location is approximately .88 of a mile from the United States and Mexico International Boundary and approximately 9.5 miles from the Tecate Port of Entry. At approximately 12:09 PM, BPA Guzman placed BROWN under arrest.

19.     At the time of arrest, the **Target Device** was found on BROWN, who claimed the **Target Device** as his property. The **Target Device** was subsequently seized.

20.     Defendant BROWN was read his Miranda rights at approximately 12:19 PM, at approximately 2:48 PM. BROWN acknowledged his rights and agreed to speak without an attorney present. BROWN stated that he traveled from Nevada to meet with a man who asked him if he wanted to make some money. The two met in a parking lot. The man said that he needed his uncle picked up and that he would pay him $600.00. BROWN agreed after learning that the location was only about 30 minutes away and the man began to read off grid coordinates to him. BROWN thought this was strange and so asked him to give him an address. The man then gave BROWN a street address and told him his "uncle's" name was "Sergio". The man said that he could just meet him back in that parking lot after picking up his "uncle". The man told BROWN that his uncle would walk out to him when he arrived in the proper area. BROWN stated he drove to the location and said that he saw a man near the porch of a property smoking a cigarette. The man had blue jeans, a blue shirt, and no backpack. BROWN said that the man started walking over towards his vehicle

8

and he thought that it must be "Sergio", so he asked him if his name was Sergio, and the man said yes.  BROWN stated that Sergio, the "uncle", got into the front seat. BROWN then stated that he began to leave the area. BROWN said that Sergio was on the phone when he got into the car and remained on the phone the entire time.  He said that Sergio was breathing heavy and was a little sweaty. BROWN stated that Sergio got into the front seat. BROWN said that he did not think anything was going on even when a Border Patrol vehicle began following him. BROWN said that he heard Sergio say "policia" on the phone which he understood to mean police.  Sergio then said to him that it was fine. Shortly after this, he said that he was pulled over. BROWN said that he rolled down his windows.  He said an officer approached and said something about U.S. Customs or something.  He said that he then asked BROWN his citizenship. BROWN said that he said that he was a U.S. Citizen and that the officer then began speaking to Sergio. After briefly speaking with Sergio, BROWN said that the officer told him to get out of the car.

21.    When asked why he fled instead of complying, BROWN said that he got scared. BROWN said that he began to figure after the stop that Sergio was illegal.  He said that he never stopped to let Sergio out of the vehicle, but that Sergio jumped from the vehicle while it was moving after they fled.  He described the area where Sergio jumped from the vehicle as rocky with a cliff on one side and grass on the other.  BROWN stated that he had marijuana in his backpack and that he only had a few other things in the vehicle.

22.    Based upon my experience and training, consultation with other law enforcement officers experienced in human smuggling investigations, and all the facts and opinions set forth in this affidavit, I believe that telephone numbers, contact names, electronic mail (email) addresses, appointment dates, messages, pictures, and other digital information are stored in the memory of the **Target Device**. In light of the above facts and my experience and training, there is probable cause to believe that the Defendant was using the **Target Device** to communicate with others to further illegal entry into the United

9

States.  Based on my training and experience, it is also not unusual for individuals, such as the Defendant, to attempt to minimize the amount of time they were involved in their smuggling activities, and for the individuals to be involved for weeks and months longer than they claim.  Accordingly, I request permission to search the **Target Device** for data beginning on **June 9, 2024 through June 23, 2024**.

## METHODOLOGY

18.   It is not possible to determine, merely by knowing the cellular telephone's make, model and serial number, the nature and types of services to which the device is subscribed and the nature of the data stored on the device. Cellular devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the network. Unlike typical computers, many cellular telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

10

19.     Following the issuance of this warrant, a case agent familiar with the investigation will collect the subject cellular telephone and subject it to analysis. All forensic analysis of the data contained within the telephone and its memory cards will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

20.     Based on the foregoing, identifying and extracting data subject to seizure pursuant to these warrants may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within ninety (90) days of the date the warrants are signed, absent further application to this court.

## PRIOR ATTEMPTS TO OBTAIN THIS EVIDENCE

21.     Law enforcement has not previously attempted to obtain the evidence sought by this warrant.

## CONCLUSION

22.     Based on the facts and information set forth above, there is probable cause to believe that a search of the **Target Device** will yield evidence of alien smuggling violation of Title 8, United States Code, Sections 1324.

23.     Because the **Target Device** was seized at the time of the defendant's arrest and have been securely stored since that time, there is probable cause to believe that such evidence continues to exist on the **Target Device**. As stated above, I believe that the appropriate date range for this search is from **June 9, 2024, through June 23, 2024**.

//

//

//

//

//

//

24.     Accordingly, I request that the Court issue warrants authorizing law enforcement to search the item described in Attachment A and seize the items listed in Attachment B using the above-described methodology.

I swear the foregoing is true and correct to the best of my knowledge and belief.

James T. Burns
Border Patrol Agent

Subscribed and sworn to before me this 4th day of September, 2024.

Hon. Jill L. Burkhardt
United States Magistrate Judge

12